Jo-Ann FARR, Plaintiff,

v.

Winston R. CHESNEY et al., Defendants.

Civ. No. 76–1328.

United States District Court, M. D. Pennsylvania.

Sept. 9, 1977.

---

**2.** See dissenting opinion of Judge Garth filed in *Sorrell* and *United States v. Thompson*, 562 F.2d 232, 239 n. 1 (3rd Cir. 1977).

Thomas B. Schmidt, III, Harrisburg, Pa., for plaintiff.

Edward E. Knauss, III, Metzger, Wickersham, Knauss & Erb, James R. Clippinger, Caldwell, Clouser & Kearns, Harrisburg, Pa., A. Lynn Corcelius, Henry, Corcelius, Gates & Gill, Huntingdon, Pa., for defendants.

## OPINION

MUIR, District Judge.

### I. Introduction.

Jo-Ann Farr has brought this action pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985, 42 U.S.C. § 2000e et seq., and 28 U.S.C. § 1331(a) alleging that the Defendants have violated her constitutional rights. Farr seeks injunctive and declaratory relief and damages. Testimony in this case was heard concerning liability before the undersigned judge beginning on August 15, 1977 and ending on August 17, 1977. Final arguments of counsel on the question of liability were heard by the Court on August 23, 1977. Following are the Court's findings of fact, discussion and conclusions of law.

### II. Findings of Fact.

1. Plaintiff is a clinical consulting psychologist, having received her doctorate in psychology from the Pennsylvania State University in November, 1974. (Undisputed)

524

2. The County Commissioners of Mifflin, Juniata and Huntingdon Counties organized a program for the prevention of mental disability and related matters pursuant to the Pennsylvania Mental Health and Mental Retardation Act of 1966.

3. The Juniata Valley Office of Mental Health and Mental Retardation (Office) implemented the above tri-county program.

4. The aforesaid three counties had in effect, at the time Plaintiff's alleged cause of action arose, a tri-party agreement, dated March 30, 1976, setting forth their respective powers, duties, and procedures with respect to the Office. (Undisputed)

5. In January, 1976, all nine of the county commissioners took office for a four-year term having been elected by the electors of their various counties. (Undisputed)

6. Of these nine persons, seven were new commissioners. (Undisputed)

7. Plaintiff performed services as a part-time consultant and sex therapist for the office. (Undisputed)

8. Plaintiff was paid at a daily per diem rate and was not carried on the payroll as a full-time employee.

9. Social security taxes, federal taxes and state taxes were not deducted from her compensation.

10. The Plaintiff was retained as a clinical consulting psychologist by the Office in May of 1974.

11. Plaintiff's work for the Office included development of an evaluation program, development of a consultative education service, and counselling and therapy work for persons served by the Office experiencing sex-related problems. (Undisputed)

12. Plaintiff performed her services for the Office during the years 1974, 1975, and 1976. (Undisputed)

13. The Plaintiff initially worked one or two days a week, for compensation of $115.00 a day beginning in May, 1974.

14. Beginning in the Summer of 1975, the Plaintiff worked three days a week during the summer and one or two days a week during the academic year (September to June), for compensation of $125.00 a day.

15. State standards for the mental health program set maximum compensation at $100.00 a day for a consultant.

16. Such services were based on arrangements between the Plaintiff and the Administrator of the Office, which were discussed periodically at the end of a fiscal year, calendar year or school term and the basic terms of service, which were always on a part-time basis, would frequently be set forth in a memorandum from the Administrator to the Plaintiff elaborating upon her duties, rate of compensation, and anticipated expenditure of time through such period. (Undisputed)

17. The Commissioners who took office in January, 1976 requested an audit of the financial affairs of the Office and audits were made by the Department of Public Welfare and the Department of the Auditor General of the Commonwealth of Pennsylvania.

18. The Plaintiff's counselling and therapeutic work was in the day-treatment program established by the Office.

19. The Plaintiff's counselling and therapeutic work was conducted with groups and individuals.

20. The Plaintiff's counselling and therapeutic work involved the exploration of behavior through language descriptive of or involved with the ideas and feelings of those persons with whom she worked.

21. The Plaintiff's use of language as a tool in her counselling and therapeutic work involved certain words, phrases and expressions with sexual references, including the word "fuck."

22. Plaintiff's use of these words, phrases and expressions, including the word "fuck," and the nature of her counselling and therapeutic work generally, are probably based on her training, education and experience as a clinical psychologist.

23. The Plaintiff is a highly esteemed member of her profession.

24. The Plaintiff performed her duties for the Office in a thorough and competent manner.

25. The Plaintiff's contracts with the Office were initially oral agreements between her and the Office's Administrator, Carl Saylor.

26. Eventually, memoranda of understanding were prepared by Carl Saylor and accepted by the Plaintiff.

27. These memoranda of understanding were prepared for administrative reasons.

28. The Plaintiff and Mr. Saylor agreed at about April 15, 1976, that the Plaintiff would work three days a week for the Office, beginning at the end of the academic year at Penn State University in May, 1976 until the beginning of the academic year at said University in September, 1976.

29. The Plaintiff advised Mr. Saylor prior to their meeting in April, 1976 that she needed a commitment from the Office so she could make decisions about other opportunities she had for consultation work during the Summer of 1976.

30. In May, 1976 Saylor told the Plaintiff that he desired to obtain the approval of the Commissioners of the three counties before increasing the number of days on which the Plaintiff provided services for the Juniata Valley Office.

31. Plaintiff was summoned with Carl Saylor to a meeting on May 6, 1976 of the Board of Commissioners of Mifflin County.

32. The Defendants DeArment, Dunkle and Yingling attended that meeting.

33. The Plaintiff was told during that meeting that the Defendants objected to her using the word "fuck" in her counselling and therapeutic work described above.

34. Defendants DeArment, Dunkle and Yingling told the Plaintiff at that meeting that she was to desist from using that word in her counselling workshops conducted for the Juniata Valley Office in Mifflin County.

35. Plaintiff, at the aforesaid meeting, advised the County Commissioners of Mifflin County that she would not refrain from using the word in her counselling and therapy work.

36. At the aforesaid meeting Plaintiff informed the County Commissioners of Mifflin County that they had the right to terminate her services but did not have the right to tell her how to perform her work.

37. When the Plaintiff asked the Commissioners of Mifflin County on May 6, 1976 if she could explain her use of the word "fuck" one of the Commissioners said "no."

38. At the meeting on May 6, 1976, the Plaintiff related to the Commissioners of Mifflin County her childhood experiences with the word "fuck".

39. The Administrator of the Office never received complaints about the Plaintiff's use of the word "fuck" in the human sexuality workshop she conducted within the Office's day treatment program.

40. Defendant Dunkle told the Plaintiff at the meeting on May 6, 1976, that the use of the word "fuck" in her counselling and therapeutic work by a woman was improper.

41. The work arrangements of Plaintiff were not approved by action of the County Commissioners after they took office January 5, 1976 and no contract was signed by all the Commissioners.

42. The Juniata Valley Office of Mental Health and Mental Retardation Administrator, Carl L. Saylor, prior to the May 17, 1976 joint meeting, advised, orally and by memo dated May 13, 1976, Plaintiff that he would need the support of the Commissioners of Mifflin, Juniata and Huntingdon Counties for retention of Plaintiff for expanded consultation services beginning May, 1976 and such proposal would be brought up at the May 17, 1976 meeting.

43. Administrator Carl L. Saylor never advised the Defendant Commissioners of Huntingdon County prior to their vote on May 17, 1976 or prior to the commencement of the present litigation that he had made any employment commitments with Plaintiff Jo-Ann Farr after June 30, 1976.

44. On May 17, 1976, the Commissioners met as a board to discuss and take action on

various matters relating to the Office. (Undisputed)

45. On May 17, 1976, the Administrator of the Office requested the County Commissioners of Mifflin, Juniata and Huntingdon Counties at their joint meeting, to consider the continued employment of Plaintiff during the months of May and June, 1976.

46. Previous to the joint meeting of the Boards of Commissioners of Juniata, Mifflin and Huntingdon Counties that was held on May 17, 1976, the Defendant Commissioners of Huntingdon County were unaware of any prior meetings between Jo-Ann Farr and the Commissioners of Mifflin County nor were they aware that the subject of Jo-Ann Farr's continued employment into the next fiscal year would be discussed and voted upon at this meeting.

47. At their joint meeting on May 17, 1976, the Defendants Shearer, Jones, DeArment, Yingling, Chesney and DiCosimo voted to terminate the Plaintiff as soon as possible.

48. Mifflin County Solicitor Searer, who was acting as the solicitor of the Joint Board, advised the Commissioners that the Earliest possible termination date for Plaintiff was June 30, 1976.

49. The Defendants relied upon the advice of legal counsel and believed they had the right to terminate Plaintiff's services on June 30, 1976 without a hearing or notice.

50. The meeting of May 17, 1976 was a public meeting. (Undisputed)

51. Juniata County Commissioners Shearer and Jones voted for termination of the Plaintiff's services because of the Plaintiff's refusal to desist from the use of the word "fuck" in her counselling and therapeutic work and because they felt that her rate of compensation was too high and exceeded the maximum permitted by state standards and that the three counties would not be compensated by the state for the excess.

52. Mifflin County Commissioners DeArment and Yingling voted for termination of Plaintiff's services for the same reasons.

53. Huntingdon County Commissioners Chesney and DiCosimo voted for termination of Plaintiff's services because they desired to promote harmony among the Boards of Commissioners of the three counties and because the Commissioners of Mifflin County represented to them that Plaintiff had been insubordinate.

54. Commissioner Delbaugh of Juniata County was absent from the meeting and Commissioner Dunkle of Mifflin County absented himself because of illness after the convention of the meeting but before the vote on Plaintiff's termination.

55. Commissioner Brown of Huntingdon County voted against termination of Plaintiff's services.

56. The Plaintiff received no notice that termination of her services would be considered by the Defendants at their meeting on May 17, 1976.

57. The Plaintiff was not given the opportunity to participate in that meeting.

58. The Commissioners of Huntingdon County, including the Defendant Commissioners of Huntingdon County, subsequent to the May 17, 1976 meeting, invited Plaintiff, among others, to discuss with them the establishment of their own Huntingdon County mental health and mental retardation program. (Undisputed)

59. The Commissioners of Huntingdon County, including the Defendant Commissioners of Huntingdon County, refused to sign a proposed resolution circulated by the Commissioners of Juniata and Mifflin Counties in June-July, 1976 to the general effect that Plaintiff should be barred from all activities and contact with the Juniata Valley Office of Mental Health and Mental Retardation. (Undisputed)

60. The Defendants did not accuse Plaintiff publicly of dishonesty or immorality or other conduct that would foreclose to Plaintiff her opportunity to take advantage of other professional opportunities.

### III. Discussion.

Jo-Ann Farr has filed this action pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985, 42

U.S.C. § 2000e, and 28 U.S.C. § 1331(a), alleging that the Defendant Commissioners of Huntingdon, Mifflin, and Juniata Counties violated her constitutional rights. The County Commissioners of these three counties organized a combined three county program for the prevention of mental disability and related matters pursuant to the Pennsylvania Mental Health and Mental Retardation Act of 1966, Act of October 20, 1966 Special Sess. P.L. 96, No. 3, 50 P.S. § 4301. The Juniata Valley Office of Mental Health and Mental Retardation (Juniata Valley Office) implements the above tricounty program. The Commissioners of Mifflin, Huntingdon and Juniata Counties sitting as a Board supervise the functioning of the Juniata Valley Office. Farr, a clinical consulting psychologist, was retained by the Juniata Valley Office of Mental Health and Mental Retardation in May, 1974. Her duties as a consultant for the Juniata Valley Office included development of an evaluation program, a consultative education service, and counselling and therapy work for persons served by the Office who were experiencing sex-related problems. Farr worked for the Juniata Valley Office during the years 1974, 1975, and 1976. She worked for the Juniata Valley Office one or two days a week for compensation of $115.00 a day beginning in May of 1974. Social security taxes, federal taxes and state taxes were not deducted from her fees. Her status was that of an independent contractor. In the summer of 1975, Farr worked three days a week and one or two days a week during the academic year, September to June, for compensation of $125.00 a day. In addition to individual counselling, Farr conducted workshops with groups of people in Mifflin, Juniata, and Huntingdon Counties. Farr's contracts with the Juniata Valley Office were oral agreements between herself and the Juniata Valley Office's administrator, Carl L. Saylor. Eventually, memoranda of understanding were prepared by Saylor and accepted by Farr.

On or about April 15, 1976, Farr and Saylor agreed that Farr would work three days a week for the Juniata Valley Office from the end of the academic year at Penn State University in May, 1976 until the beginning of the academic year at that University in September, 1976. On May 6, 1976, without any prior notice concerning the content of the meeting, Farr was summoned with Saylor to a meeting of the Board of Commissioners of Mifflin County. Defendants DeArment, Dunkle and Yingling, who were then and are now Commissioners of Mifflin County, attended that meeting. They informed Farr that they objected to her use of the word "fuck" in her counselling and therapeutic work for the Juniata Valley Office and that she was to desist from using that word in her counselling workshops conducted for the Juniata Valley Office in Mifflin County. Farr responded that she would not refrain from using the word in her counselling and therapeutic work and asked for an opportunity to explain the reason that she had spoken the word. Defendant Dunkle informed Farr at the May 6, 1976 meeting that the use of the word "fuck" in her counselling and therapeutic work by a woman was improper. On May 17, 1976, the Commissioners of the three counties, Mifflin, Juniata, and Huntingdon, which formed the Juniata Valley Office of Mental Health and Mental Retardation met as a Board to discuss and take action on various matters relating to the operation of the Juniata Valley Office. On the agenda of that meeting was a request from the administrator of the Juniata Valley Office, Carl L. Saylor, to consider the continued employment of Farr during the months of May and June, 1976. At this joint meeting on May 17, 1976, all of the Defendants present, Winston R. Chesney, James DiCosimo, Commissioners of Huntingdon County, Pennsylvania, Ronald C. Shearer and M. Richard Jones, Commissioners of Juniata County, Dallie R. DeArment, and Herbert K. Yingling, Commissioners of Mifflin County, Pennsylvania, voted to end Farr's consultation work for the Juniata Valley Office as soon as possible. Farr was not notified that her termination as a consultant for the Juniata Valley Office would be considered at the meeting. The termina-

tion was to become effective at the date any ongoing contract that the Juniata Valley Office had with Farr expired. The solicitor of Mifflin County who was present at the meeting and acting as the solicitor for the Joint Board advised the Commissioners of the three counties the following day that Farr's contract with the Juniata Valley Office ended on June 30, 1976. Farr contends that the termination of her services as a consultant deprived her of property and liberty without due process of law and constituted sexual discrimination in violation of 42 U.S.C. § 2000e, 42 U.S.C. § 1985 and the equal protection clause of the Fourteenth Amendment of the United States Constitution. The Court will deal with these claims *seriatim.*

■ First, Farr maintains that she had a contract with the Juniata Valley Office until September, 1976 and that her services as an independent contractor could not be terminated without the protections of due process as required by the Fourteenth Amendment of the United States Constitution. To determine whether Farr was deprived of property without due process of law requires a two-step inquiry. First, the Court must determine the extent of Farr's property rights, if any, in this context. Then, if Farr has some property interest which has been impaired by the action of the Defendants, it becomes necessary to analyze whether the deprivation of property violated the due process clause of the Fourteenth Amendment. *Skehan v. Board of Trustees of Bloomsburg State College,* 501 F.2d 31, 38 (3d Cir. 1974), vacated and remanded, on other grounds, 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975), 538 F.2d 53 (3d Cir. 1976); *Chung v. Park,* 514 F.2d 382 (3d Cir. 1975), cert. denied, 423 U.S. 948, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975); *MacMurray v. Board of Trustees of Bloomsburg College,* 428 F.Supp. 1171 (M.D. Pa.1977); *DiLuigi v. Mier,* 430 F.Supp. 1098, 1100 (M.D.Pa.1977). The Fourteenth Amendment does not create property interests. They stem from independent sources such as state law. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Bishop v. Wood,* 426

U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Thus, Farr must show that she had a legitimate claim of entitlement pursuant to the law of Pennsylvania to continue acting as a consultant beyond June 30, 1976 which was the date upon which the termination of her services was effective.

■ Farr contends that the oral agreement which she made with Saylor, the administrator of the Juniata Valley Office of Mental Health and Mental Retardation, created a valid contract between Farr and the Juniata Valley Office. Oral contracts are binding in Pennsylvania. *Egyptian S. R. Est. Inc. v. Polony ex ux.* 222 Pa.Super. 315, 294 A.2d 799 (1972). The Defendants contend that because of a provision in the Juniata Valley Tri-County Agreement for Mental Health and Mental Retardation the contract between Saylor and Farr was void. That provision is ¶ 19 which reads as follows:

> "Official documents, contracts, or other legal papers shall be binding upon the Program and the Counties only if they are signed by the County Administrator, and members of all three Boards of County Commissioners, and said County Commissioners' signatures are attested by the Chief Clerk of the respective Counties; excepting, however, all agreements made and approved on the "Mental Health-Mental Retardation Service Rendered Report" (presently referred to as Mental Health-Mental Retardation Form 13) need be signed only by the County Administrator."

The Defendants maintain that ¶ 19 requires that all contracts be in writing and be signed by the county commissioners of all three counties. This is not what ¶ 19 says. This inartfully drawn provision refers to written contracts. The phrase "Official documents, contracts or other legal papers," clearly refers only to written instruments. The Defendants participated in the drawing of this agreement. The law of Pennsylvania construes an 'ambiguous agreement against the party having drafted it. *Egyptian S. R. Est. Inc. v. Polony et ux., supra* ;

3 A. L. Corbin, Contracts § 559 (1960). It is the Court's view that ¶ 19 was meant to refer only to written contracts and not to affect oral agreements.

■ The Defendants also maintain that Pennsylvania law does not permit them to enter into a binding contract with a public employee in the absence of a grant of such power from the legislature. In *Scott v. Phila. Parking Auth.,* 402 Pa. 151, 166 A.2d 278 (1960), the Supreme Court of Pennsylvania stated that a public authority in the absence of a specific grant from the legislature lacked the ability to enter into a binding employment contract with an employee. The Court based its decision in part on the policy that individuals working on an annual basis in a close and confidential relationship with a public authority must necessarily be responsible to that authority and should be able to be replaced with ease. The Court specifically stated that its decision did not concern contracts for work on particular and specific projects being carried out by a public body which might necessitate the temporary services of some specialist. See *Beloff v. Margiotti,* 328 Pa. 432, 197 A. 223 (1938). Farr was hired on a part time basis for a limited period of time as a specialist, a sex therapist, to work on specific projects, the counselling of clients and conducting of workshops. The Court concludes that under the law of Pennsylvania the Juniata Valley Office could enter into a binding oral contract with Farr.

■ The Defendants also contend that Carl Saylor, by his conduct in May, 1976 made clear to Farr that he did not have authority to hire her as a consultant for additional days during the summer of 1976. This is based on Saylor's statement to Farr confirmed by a memo that he felt that he should obtain the approval of the Commissioners of the three counties before increasing the number of days on which Dr. Farr provided services for the Juniata Valley Office. Saylor's view of his legal authority is not determinative of whether or not he had the power to enter into a binding contract for the services of Dr. Farr. His statement that he should receive the approval of the Commissioners of the three counties could have been because concern had been expressed by some of the Commissioners that Dr. Farr's compensation was $125.00 a day, which was in excess of the $100.00 per day maximum set forth by state standards for the mental health program. There was some uneasiness on the part of the Commissioners that payments in excess of $100.00 would not be honored by the Commonwealth of Pennsylvania and might result in loss of funding for the Juniata Valley Office. The Commissioners of the three counties in no way acted to curtail Saylor's ability to hire independent contractors to perform various services required for the Mental Health and Mental Retardation program carried out by the Juniata Valley Office. Saylor had entered into oral agreements with Dr. Farr in previous years. There was no reason for her to suspect that in April, 1976 he lacked the authority to do the same. Although the Commissioners of Mifflin and Juniata Counties had just taken office in January, 1976, they cannot assert their recent election undermined the authority of Saylor. As of April, 1976, the newly elected commissioners had taken no action to prevent Saylor from entering into contracts with consultants on behalf of the Juniata Valley Office. Saylor had at least apparent authority and may have had actual authority to enter into a contract with Dr. Farr in April, 1976. Act of October 20, 1966, P.L. 96, No. 3, 50 P.S. §§ 4102, 4301(d)(2), 4305(2). An independent contractor's agreement with a public agency is a legitimate and binding entitlement to property in this context. Although the degree of due process which may attach may not be equivalent to that to which a public employee is entitled, certainly due process is required before the services of an independent contractor can be terminated. When Farr was discharged as a consultant on June 30, 1976, she still had over two months to run on her contract with the Juniata Valley Office.

■ The next step is to determine if Farr received procedures adequate to meet the standards of the due process clause of the

Fourteenth Amendment. Due process does not mandate inflexible procedures universally applicable to every imaginable situation. *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Due process does require at a minimum that deprivation of property be preceded by notice and an opportunity for hearing appropriate to the nature of the case. *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Farr received no notice concerning the reason for her being summoned to a meeting of the Mifflin County Commissioners on May 6, 1976. At that meeting, when she was told that she was not to use the word "fuck" again she was given no opportunity to explain in detail her reasons for her use of that word. When she asked if the Commissioners desired to hear the justification for her conduct she was told by one of the Commissioners, "no". Although she did relate to the Commissioners her childhood experiences with that word, this cannot be considered an adequate opportunity to explain her conduct because of the lack of prior notice. In addition, she was never told that the Commissioners of all three counties were going to meet on May 17, 1976 and at that meeting termination of her services as a consultant would be considered. She was given no notice of the meeting and given no opportunity to present a defense of her conduct before the Commissioners of all three counties. Consequently, the termination of Farr as a consultant violated the due process clause of the Fourteenth Amendment. Because Farr has requested declaratory relief pursuant to 28 U.S.C. § 2201 the Court will enter judgment for Farr on this issue.

■ Farr seeks monetary damages from the Defendants for a violation of her constitutional rights. The Defendants can avoid personal liability if they establish by a preponderance of the evidence that they meet the good faith test set forth in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). See *Skehan v. Board of Trustees,* 538 F.2d 53, 59–62 (3d Cir. 1976); *Thompson v. Parole Supervisor Burke, et al.,* 556 F.2d 231 (3d Cir. 1977). In *Wood,* the Court held that an official is not immune to liability for damages under § 1983 if he knew or reasonably should have known that the action he took (1) would violate the constitutional rights of the individual affected or if the action he took was (2) with a malicious intention to deprive the individual of his constitutional rights or cause him to suffer other injury. A compensatory award will be appropriate only if the official acted with such an impermissible motivation or with such disregard of the Plaintiff's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith. *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

■ The Defendants have established by a preponderance of the evidence that their failure to accord Farr due process before terminating her services was without malice. The Mifflin and Juniata Commissioners who voted to terminate Farr's services did so for two reasons. First, they felt that her rate of compensation at $125.00 per day was too high and was in violation of the maximum rate for consultants set by state law. They were concerned that the counties would not be reimbursed for the amount of Farr's compensation in excess of the state guidelines. Second, and most importantly, they felt that the use of the word "fuck" by Farr was not appropriate and that her expressed unwillingness to cease using that word was insubordinate. No evidence of personal malice or malicious intent to deprive Farr of her due process rights or cause her other injury exists. The statement of Commissioner Dunkle that the use of the word "fuck" by a woman was improper does not by itself constitute malice. Commissioner Dunkle testified that in his view the use of that word by anyone was improper. The two Commissioners of Huntingdon County who voted to terminate Farr did so because they desired to promote harmony among the Boards of Commissioners of the three counties and because the Commissioners of Mifflin County represented to them that Farr had been insubordinate.

The Defendants have also established by a preponderance of the evidence that they did not know nor reasonably should have known that the action they took violated the constitutional rights of Farr. Before determining the effective date of Farr's termination, the Defendants asked the County Solicitor of Mifflin County to advise them as to the last day of Farr's contract with the Juniata Valley Office. The County Solicitor reported that the last day of Farr's contract was June 30, 1976. The Defendants were under no obligation to inquire as to whether their actions violated due process. It is enough that they consulted a lawyer who was aware of the factual situation. Farr maintains that if an attorney consulted by a public official does not have minimum knowledge of the Constitution, the public official should be held liable for the lack of the attorney's knowledge. Such a rule of law would impose an unfair burden upon public officials, many of whom have no opportunity to select their own counsel but must depend upon attorneys hired by the governmental agencies for whom they work. In addition, the pubic official in most instances cannot be expected to judge the knowledge of the attorney upon whose advice he depends. But a public official cannot engage in conduct which he obviously should have known violated the constitution and hide behind his attorney's ignorance. Certainly a constitutional right can be so clearly established that it is unreasonable for a Defendant to rely upon contrary advice from legal counsel. *MacMurray v. Board of Trustees of Bloomsburg State College,* 428 F.Supp. 1171, 1177 (M.D. Pa.1977). Whether or not Farr had a valid contract with the Juniata Valley Office beyond June 30, 1976 and thus was entitled to the safeguards of due process was not a clearly established constitutional right. The Defendants cannot be charged with knowledge of the complexities of Pennsylvania contract law. It was not unreasonable for the Defendants to rely upon the advice of the County Solicitor of Mifflin County. Consequently, the Defendants are immune from damages individually for terminating Farr's services as a consultant in violation of the due process clause of the Fourteenth Amendment.

The issue of what equitable remedies should be imposed still remains. Farr may be entitled to her fees for the remainder of her contract period after June 30, 1976. Because the Court bifurcated this case, the Court heard no testimony concerning the appropriateness of any equitable remedies. The Court is concerned about the propriety of imposing any award of back pay against the Counties through the County Commissioners. Of course, an award of back pay against the Defendants in their individual capacity is prevented by the defense of good faith. *Demkowicz v. Endry,* 411 F.Supp. 1184 (S.D.Ohio 1975). *Conta Paxman v. Wilkerson,* 390 F.Supp. 442 (E.D.Va. 1975); *Schreiber v. Joint School District No. 1,* 335 F.Supp. 745 (E.D.Wis.1972). The Court is also concerned about whether an action for back pay against a municipality can be maintained pursuant to 28 U.S.C. § 1331. The United States Court of Appeals for the Third Circuit has not decided this issue. Other circuits are divided as to the propriety of such an action. *Gagliardi v. Flint et al.,* 564 F.2d 112 (3d Cir. 1977). If within 10 days any counsel files a written request therefor, the Court will place this case for the purposes of determining what equitable relief, if any, is appropriate at the end of the September, 1977 trial list with trial briefs and other pre-trial documents to be filed by 9:30 A.M. on the day the case is reached for trial. If no such written request is filed, the Court will dispose of the matter on briefs which will then be due within 15 days from the date of this Opinion.

Farr in her complaint has asked for attorney's fees. No request for attorney's fees has been filed with the Court. If Farr intends to ask for attorney's fees, she shall file an appropriate motion, a statement of the services rendered in compliance with the practice order issued shortly after this case was filed and a supporting brief within 30 days of the date of this opinion. If such a motion for counsel fees is filed and the Defendants oppose the same, the Court will

set the matter down for a subsequent hearing.

■ Farr also contends that she was denied liberty without due process of law in violation of the Fourteenth Amendment of the United States Constitution. According to Farr, she has a liberty interest in conducting her occupation as a psychologist according to what she considers professional standards. The Court is of the view that Farr at all times relevant to this case probably acted consistently with the professional standards of a psychologist dealing in the area of sexual relations. But there is no constitutional right for an independent contractor working for a public agency to conduct him or herself in a manner which conflicts with the desires of that agency. As long as Farr has the right to work for other governmental agencies and other private employers, her liberty interest has not been compromised. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Farr has not shown that her ability to work for other governmental agencies has been impaired. In fact the Commissioners of Huntingdon County discussed with Farr, after the termination of her contract, the possibility of establishing their own mental health and mental retardation program. Consequently, Farr's contention that she had a liberty interest in conducting activities as a sex therapist in the manner which she saw fit is denied by the Court.

■ Third, Farr maintains that she had a liberty interest pursuant to the Fourteenth Amendment to engage in her occupation as a sex therapist and that this interest was violated by certain aspersions made concerning her moral character by the Defendants. The Fourteenth Amendment's guarantee of liberty to engage in any of the common occupations of life is violated when the state denies a hearing to a discharged employee who has been accused publicly of dishonesty or immorality. *Cox v. Northern Virginia Transportation Commission,* 551 F.2d 555, 558 (4th Cir. 1976); *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Farr has not estab-

lished by a preponderance of the evidence that the Defendants did accuse her publicly of dishonesty or immorality or otherwise impugn her character. *Wahba v. New York University,* 492 F.2d 96 (2d Cir. 1974), cert. denied, 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974); *Shirck v. Thomas,* 486 F.2d 691 (7th Cir. 1973); *Lipp v. Board of Ed. of City of Chicago,* 470 F.2d 802 (7th Cir. 1972); *Keddie v. Pennsylvania State University,* 412 F.Supp. 1264 (M.D.Pa.1976). No evidence was introduced by Farr to establish this point. Consequently, this contention will be denied.

■ Fourth, Farr contends that she was discharged because she was a woman pursuant to a conspiracy among the County Commissioners in violation of 42 U.S.C. § 1985, 42 U.S.C. § 2000e, and the equal protection clause of the Fourteenth Amendment of the United States Constitution. The only evidence of sex discrimination which Farr has shown is that Commissioner Dunkle told Farr at the meeting on May 6, 1976 that the use of the word "fuck" in her counselling and therapeutic work by a woman was improper. This is not enough to show that Farr was discharged by the Defendants because she was a woman. Dunkle testified that he would have been in favor of discharging a man for the use of that word. Farr produced no evidence to indicate that Dunkle wished to terminate Farr because she was a woman. The Defendants voted to cease using Farr as a consultant because they felt that she charged too much and because they disapproved of her use of the word "fuck". Farr has not shown by a preponderance of the evidence that a man acting as a sex therapist using that word would have been treated in a different manner. Consequently, Farr's claim that she was discharged because of her sex is denied.

The Court reaches the following

### IV. Conclusions of Law.

1. Farr had a binding contract with the Juniata Valley Office of Mental Health and Mental Retardation until the first week of September, 1976.

2. Farr was an independent contractor with the Juniata Valley Office, not an employee.

3. Dismissal of Farr as a consultant by the Commissioners of Juniata, Huntingdon, and Mifflin Counties without prior notice and a hearing violated the due process clause of the Fourteenth Amendment.

4. Farr had no liberty interest in using the word "fuck" when she was acting as a consultant for the Juniata Valley Office of Mental Health and Mental Retardation.

5. The Defendants violated no liberty interest of Farr.

6. The Defendants in terminating Farr's services without notice or a hearing acted without malicious intent to injure Farr and without intent to violate her constitutional rights.

7. The Defendants did not know and should not have reasonably known that their termination of Farr violated the due process clause of the Fourteenth Amendment.

An appropriate order will be entered.

### ORDER

1. It is declared that the Defendants violated Farr's right to due process pursuant to the Fourteenth Amendment of the United States Constitution and therefore the Clerk of Court shall enter judgment for Farr on this issue.

2. If within 10 days any counsel files a written request therefor, this case will be placed at the end of the current September, 1977 list as Case # 17, following *MacMurray v. Bloomsburg State College* in order to hear testimony concerning what equitable remedies, if any, Farr is entitled to for the violation of her due process rights. If no such written request is filed, the Court will dispose of the matter on briefs which will then be due within 15 days from the date of this Order.

3. Farr, if she intends to ask for attorney's fees, shall file an appropriate motion, a statement of the services rendered in compliance with this Court's Order # 2 of October 26, 1976 and a supporting brief within 30 days of the date of this Order and the preceding Opinion.